1

2

3

4

5

6

7

Hon. Ronald B. Leighton

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

9

10

DREW TRACY, DUANE SCHUMAN,
RICK STEELE, CHRIS LINES, DANIEL
KEVIN GRIFFEE, RICHARD HUFFMAN,
LEE HAZELTON and SCOTT WILLIS,
individually,

No. 3:17-cv-05414-RBL

11

DEFENDANT CITY OF
VANCOUVER'S CROSS-MOTION FOR
SUMMARY JUDGMENT

12

13

Plaintiffs,

**NOTE ON MOTION CALENDAR**:
Friday, August 24, 2018

14

vs.

15

CITY OF VANCOUVER, a municipality,

Without oral argument

16

Defendant.

17

18

19

20

21

22

23

24

25

1

# TABLE OF CONTENTS

2

TABLE OF CONTENTS ........................................................................................... i

I.  INTRODUCTION ......................................................................................... 1

II.  FACTS .......................................................................................................... 2

    A.  Vancouver Fire Battalion Chiefs, who spend on average less than 3 percent of their time responding to calls, are management level positions. ................................ 3

        1.  A BC's scene response, which occurs less than 3 percent of the time, almost invariably yields management functions as opposed to emergency response duties handled by subordinates. ............................................................. 4

        2.  The majority of the BC's shift hours are spent conducting training, managing personnel, and performing other supervisory functions. .................... 7

    B.  Well over a decade ago, the union representing the BCs negotiated a reduced shift-overtime rate in exchange for additional benefits, an agreement that has remained unchanged ever since. ............................................................................. 9

III.  ISSUES PRESENTED .................................................................................. 11

IV.  ARGUMENT AND AUTHORITY ................................................................ 11

    A.  Background of FLSA, its exemptions, and DOL's interpretive role. ...................... 13

    B.  Vancouver Fire Department Battalion Chiefs meet the DOL's definition of HCEs because they are highly compensated, perform management duties weekly, and their primary duty is management which includes office and/or non-manual labor. ................................................................................................. 14

        1.  The Plaintiffs easily and undisputedly satisfy the first two elements of the HCE test. ........................................................................................................ 15

            a.  DOL regulations and the agency's interpretation thereof, all of which are entitled to judicial deference, provide that a high-ranking member of a fire department whose primary duty is management may still be exempt as an HCE ................................................................................ 17

            b.  Case law has embraced the position of the DOL to limit application of the "first responder" regulation to those whose primary duty is fighting fires on the front lines rather than in command away from the emergency. ........................................................................................... 19

        2.  So long as the fire department employee's primary duty is management, which is the case here, the first responder regulation does not compel the nonexempt status of a battalion chief. .................................................... 16

5925.docx

DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - i

(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

**TABLE OF CONTENTS (continued)**

3.   A VFD battalion chief's primary duty is management, which is predominated by office work and non-manual labor, thereby confirming application of the HCE exemption. ...................................................22

a.   Serving as incident commander is a management duty where, as here, the overwhelming majority of time is not spent contemporaneous to traditional first responder duties ..................................................24

b.   Plaintiffs, as battalion chiefs, spend the majority of their time performing exempt, management work.......................................26

c.   It is undisputed that the BCs enjoy relative freedom from direct supervision and are paid substantially more than front line firefighters and captains ......................................................................29

C.   Even assuming the HCE cannot be applied to BCs, Plaintiffs are still exempt under the four-part "executive" test or combination test...........................................30

D.   At a minimum, the Court should hold that Tracy and Huffman were exempt executive, administrative, or combination employees during their acting tenures as Deputy Chief and Division Chief. ..........................................33

E.   Plaintiffs have insufficient evidence to overcome the presumptive two-year statute of limitations for FLSA claims. ...................................................35

V.   CONCLUSION ....................................................................................... 36

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - ii
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

## I.  INTRODUCTION

Roughly 15 years ago, the union representing the Vancouver Fire Department Battalion Chiefs ("BCs") collectively bargained a reduced shift-overtime rate in exchange for several additional employment benefits, such as an increased margin in pay between a BC and a captain as well as increased tuition reimbursement. After researching whether such an arrangement would comply with the Fair Labor Standards Act, 29 U.S.C. §§ 201-213 ("FLSA"), Defendant City of Vancouver agreed and beginning with the 2004 collective bargaining agreement ("CBA"), Vancouver BCs have been paid a rate of 1.25 the regular rate for all shift overtime. Plaintiffs, six retired and two current BCs, filed this lawsuit alleging this agreed overtime rate that has been in place for well over a decade violates the FLSA.

The essence of Plaintiffs' claims is that because BCs respond to calls for service, even though occurring less than three percent of the time they are on duty and at a frequency far less than that of their subordinates, they are "first responders" and are therefore categorically non-exempt under 29 C.F.R. § 541.3(b). That regulation, however, presumes that the worker's "primary duty is not management," *id.* § 541.3(b)(2), and the Department of Labor ("DOL") has repeatedly maintained that upper echelon members of a fire department—like battalion chiefs—most certainly can be exempt when their primary duty is management. *See* U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter FLSA 2005-40 (Oct. 14, 2005), *available at* https://www.dol.gov/whd/opinion/FLSA/2005/2005_10_14_40_FLSA.pdf [hereinafter "2005 DOL Opinion Letter"]. That is the case here.

Plaintiffs cannot and do not dispute that each of them: (1) earned well over $100,000 annually up through 2015 and well over $134,000 annually thereafter, and (2) performed one or more management duties on a weekly basis. Coupled with the irrefutable fact that the primary duty of battalion chiefs—managing their respective battalions— includes office and/or non-manual work, Plaintiffs are "highly compensated employees" ("HCEs") as a matter of law under 29 C.F.R. § 541.601(a) and are therefore exempt from FLSA overtime coverage pursuant

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 1
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

1  to 29 U.S.C. § 213(a)(1). And even if this Court were to bypass the streamlined HCE

2  exemption analysis, the Plaintiffs are equally exempt under the traditional four-part test for

3  executives. 29 C.F.R. § 541.100. Consequently, Plaintiffs' sole claim of entitlement to

4  additional compensation under the FLSA fails, mandating summary judgment for the City.

5                                              **II. FACTS**

6         Each Plaintiff has, at some point within the two-year period preceding this

7  commencement of this action on May 31, 2017 (Dkt. 1), worked as a battalion chief for the

8  City of Vancouver Fire Department. And each Plaintiff, while working as a battalion chief,

9  earned a base annual salary throughout that time of $123,360-$136,008, not including the

10  overtime they are already paid per their collective bargaining agreement. (Coleman Decl., Ex. 1

11  at 24-25; Lloyd Decl., Ex. I (RFAs 9-69).) The following Plaintiffs worked exclusively as BCs

12  during the following periods: Plaintiff Kevin Griffee from March 6, 2000 through his

13  retirement on June 30, 2016[1] (Griffee dep. at 8-20-9:8);[2] Plaintiff Duane Schuman from April

14  5, 2011, through his retirement on June 28, 2017 (Schuman dep. at 8:2-10); Plaintiff Rick

15  Steele from September 14, 2012, through his retirement on January 7, 2018 (Steele dep. at

16  7:21-8:19); Plaintiff Chris Lines from September 14, 2012, through his retirement on

17  September 15, 2017 (Lines dep. at 8:7-9:6); Plaintiff Lee Hazelton from April 4, 2011, through

18  his retirement on June 15, 2017 (Hazelton dep. at 8:11-21); and Plaintiff Scott Willis from

19  September 1, 2016, through the present (Willis dep. at 7:19-8:6.).

20         Plaintiffs Drew Tracy and Rick Huffman both held permanent ranks of battalion chiefs,

21  but also served acting assignments in administrative roles. Plaintiff Huffman was promoted to

22  BC on June 16, 2008, and held that rank continuously until his retirement on August 31, 2016.

---

[1] Griffee served as Acting Deputy Chief for a two-year period that concluded in 2012. (Griffee dep. at 8:24-9:6.)

[2] The deposition excerpts supporting this motion are all attached to the contemporaneously filed Declaration of Daniel G. Lloyd as the following exhibits: **Exhibit A:** D. Kevin Griffee; **Exhibit B:** Drew Tracy; **Exhibit C:** Rick Huffman; **Exhibit D:** Duane Schuman; **Exhibit E:** Lee Hazelton; **Exhibit F:** Chris Lines; **Exhibit G:** Rick Steele; **Exhibit H:** Scott Willis; **Exhibit K:** Doug Koellermeier; **Exhibit L:** Chad Michael; **Exhibit M:** Joe Molina; **Exhibit N**: Heidi Scarpelli.

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 2
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

1  (Huffman dep. at 8:22-10:7.) However, he served as the Acting Training Chief—the rank of
2  Division Chief—from December 2011 through December 31, 2014. (*Id.* at 8:25-9:25.) Plaintiff
3  Tracy was promoted to BC on March 16, 2013, and holds that rank today. (Tracy dep. at 7:16-
4  8:9.) He served two acting assignments, though—first as Acting Deputy Chief from March 17,
5  2014, through February 1, 2015, and as Acting Training Chief from February 1, 2015, though
6  August 28, 2016. (*Id.* at 7:20-8:22.)

7    **A.    Vancouver Fire Battalion Chiefs, who spend on average less than 3 percent
         of their time responding to calls, are management level positions.**

8      A battalion chief is one of four "Chief" positions in the Vancouver Fire Department.
9  (Molina Decl. ¶ 2.) The BCs oversee the "fire suppression" division of the VFD, which is made
10 up of two battalions. (Steele dep. at 13:12-17.) Each battalion includes five engines and one
11 truck (Griffee dep. at 32:12-13); each engine and truck has a captain and at least two
12 firefighters and a firefighter-paramedic. (Hazelton dep. 18:8-12; *see* also Molina Decl. ¶ 2).

13     Per their CBA, battalion chiefs assigned to work 24-hour shifts, separated by several
14 days to ensure that "the weekly hours of duty … average 48 hours per week on an annual
15 basis," with an additional day off (known as a "Kelly day") "every seventh shift." (Coleman
16 Decl., Ex. 1 § 4.1.) Occasionally, a BC is unable to work a shift, which requires one of the four
17 off-duty BCs to cover. This is known as "shift overtime," which has been paid at an increased
18 rate of time-and-a-quarter (1.25) since 2004. (*Id.* ¶ 2 & Ex. 1 § 7.1(A); Ex. 2 § 6.1; Ex. 4
19 § 7.1(A).) All other overtime, such as chiefs' only meetings, is paid at a rate of time-and-a-half
20 (1.5.) (*Id.*, Ex. 1 § 7.1(B).) This "other" overtime is not a part of this lawsuit. (Tracy dep. at
21 15:14-21.) Plaintiffs have equivocated on whether Huffman and Tracy's out-of-class
22 assignments as Training Chief and Deputy Chief are part of the lawsuit. (*See id.* at 9:4-12.)

23     The BC job description was examined by the Plaintiffs at deposition, who affirmed that
24 the following accurately summarizes the job:
25

*Manage all activities of a battalion* on an assigned s[h]ift in the Emergency Services Division, including commanding and coordinating firefighting and rescue functions; *manage the training*, *supervision*, and *evaluation of personnel*;

….

*This is a management level position* involving the *coordination and administration of the activities of an entire shift*. Provide *direct supervision* of subordinate[] officers.

(Griffee dep. at 18:3-23:23 & dep. ex. 2 (emphasis added).) Essential functions include:

1.    Direct, assign, and supervise all firefighting forces on assigned shift; respond to emergency incidents as needed; ascertain the need for and the type of additional equipment necessary to counteract an emergency; make technical and supervisory decisions as to the best methods of extinguishing fires after observing the fire and/or after receiving oral reports from company officers.

2.    Make periodic inspections of personnel and review general condition of apparatus and facilities.

3.    As Shift Commander, participate in the training of personnel and serve as an instructor for specialized in-service training courses; implement assigned training as directed.

….

5.    Conduct performance appraisals of company officers in accordance with departmental guidelines.

(*Id.*, dep. ex. 2 at 1.) The job description further provided that the work was "[t]ypically … performed in a fire station office or command van." (*Id.*, dep. ex. 2 at 3; *see also* Tracy dep. at 10:5-11, 53:7-55:3, 57:3-9 & dep. ex. 1.) Command vans were later replaced with sport-utility vehicles. (Griffee dep. at 28:6-12; Lines dep. at 11:4-7, 23:15-24:10.)

> **1.    A BC's scene response, which occurs less than 3 percent of the time, almost invariably yields management functions as opposed to emergency response duties handled by subordinates.**

Calls for emergency response trigger the Clark Regional Emergency Services Agency (CRESA) to dispatch the appropriate personnel, which most often is a "single unit" response involving either a rescue truck, fire engine, or fire truck—not a BC. (Molina Decl. ¶ 8; DeVore Decl. ¶ 1; *see also* Schuman dep. at 103:8-104:4.) BCs are dispatched only "on events that

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 4
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

warrant an incident command structure" (DeVore Decl. ¶ 3), such as those requiring multiple companies, marine incidents, structure fires, and incidents outside city limits. (Tracy dep. at 17:13-18:4, 29:19-30:4; Molina Decl. ¶ 8.) When dispatched, BCs always take sport-utility vehicles reserved "exclusively" for them. (Hazelton dep. at 20:13-19; Willis dep. at 29:14-21; Steele dep. at 25:20-21; Griffee dep. at 27:25-28:25.) With the exception of Plaintiffs Griffee and Huffman, each Plaintiff affirmed that he would notify CRESA of the exact time they responded. (Tracy dep. at 16:9-17:12; Schuman dep. at 25:5-27:10; Lines dep. at 24:1-28:6; Hazelton dep. at 20:20-23:6; Steele dep. at 28:25-29:7; Willis dep. at 29:22-30:16.) Griffee and Huffman estimated that they would notify CRESA of their whereabouts 80 percent of the time, but that 20 percent of the time they would "add themselves" to a call without advising dispatch. (Griffee dep. at 29:1-30:13; Huffman dep. at 17:19-20:9.) It is undisputed BCs had this level of authority and discretion to do so. (*Compare id.* to Michael Decl. ¶ 2.)

CRESA tracks this data, and is able to report the amount of time those two BC units—reserved exclusively for BCs—are responding to calls. (DeVore Decl. ¶ 4.) Kris DeVore, CRESA's Operations Division Manager, extracted data from CRESA's systems, which reported in hours, minutes, and seconds each BC unit that was being utilized during a given month, which in turn reflects the amount of time Plaintiffs responded to calls. Given that two BCs are on duty 24 hours per day, seven days per week, one can calculate the percentage of time BCs were responding to incidents. (DeVore Decl. ¶¶ 4-5 & Ex. 1.) Account Neil Beaton performed this calculation, revealing that on average, BCs spent only 2.2% of their time responding to calls. (Beaton Decl., Ex. 1; *compare* BC1 (3/1/14-4/1/14) *to* BC2 (7/1/15-8/1/15 & 8/1/17-9/1/17).) Furthermore, as Ms. DeVore notes, BCs often leave a call without clearing their unit, so the amount of documented time a BC is "on" a call is inflated because the clock continues to run even after the BC has left. (DeVore Decl. ¶¶ 3, 5.) However, even if one augmented 2.2% by the 20 percent shortfall as per Griffee and Huffman and ignored the "non-clearance" times, the average percentage increases to only 2.8%. (Beaton Decl. ¶ 4 & Ex. 1.)

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 5
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

The BC who arrives on scene first becomes "the incident commander every time." (Hazelton dep. 25:23-25.) On larger incidents, the second arriving BC may either assist with incident command or may "gear up" and become a "division supervisor." (Lines dep. at 33:17-20; Michael dep. at 83:20-22.) These types of "large[r] incidents" requiring multiple BCs "are definitely less frequent." (Lines dep. at 33:13-15; *see also* Hazelton dep. at 26:5-14.) The overwhelming majority of the time, a BC who responds serves as the incident commander. (Schuman dep. at 31:19-23; Hazelton dep. at 24:21-25:5; Griffee dep. at 44:14-16.)

The incident commander is responsible for the tactics employed and resources used. (Griffee dep. at 14:10-12, 15:1-8; Hazelton dep. at 23:22-24:15; Lines dep. at 29:7-12; Tracy dep. at 32:16-21.) The BC filling this role receives a report from the on-scene captain and takes command of the scene. (Tracy dep. at 18:5-17; Schuman dep. at 32:15-34:7.) The BC may alternatively determine that he is not needed. (Steele dep. at 42:15-24.) In those cases, the BC has the discretion to leave the call entirely. (Tracy dep. at 32:18-33:18; Molina Decl. ¶ 8.) Incident commanders do not wear full "turnouts," or protective clothes and gear while incident commander, as they are unlikely to work in the "hot zone" of an emergency. (Hazelton dep. at 26:5-8; Lines dep. at 29:3-4; Griffee dep. at 45:12-15.) Instead, the command vehicle (i.e., SUV) becomes the BC's on-scene "office," and he performs his functions at all times from the vehicle, so as to present a central point of contact for the first responder crews. (Willis dep. at 34:5-9; 35:20-21; *see also* Lines dep. at 29:1-12.) Only on rare occasion when multiple BCs respond does the second BC wear the full turnouts. (Hazelton dep. at 25:24-26:14; Michael Decl. ¶ 5.) In those less frequent situations, a BC "could" in theory hold the hose, but such a contingency rarely, if ever, occurred. (Lines dep. at 39:17-40:10; Griffee dep. at 43:22-44:20; Huffman dep. at 27:15-28:24; Tracy dep. at 18:18-23.)

Although the VFD implemented standard operating procedures, the BC retains an "overarching responsibility [to be aware] of everything from [the command] vehicle." (Willis dep. at 35:20-21.) As Plaintiff Griffee described:

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 6
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

1
2

> You hold the highest scene authority to make emergency calls on that scene, to detail the management system that's going to be used for that type of incident, whether it's a high-rise fire, a ship fire, a structure fire, a multi-casualty incident with a number of victims. You lay out the management system for that incident.

3
4
5

> That's your sole responsibility on duty is to ensure the safety of the firefighters and the community, whether you have to do evacuations, anything. You ultimately own that in the end. So you are saying I will own these calls on a day-to-day basis for the city of Vancouver.

6

(Griffee dep. at 15:1-14.) To effectively resolve the emergency, the BC breaks the incident into

7

geographic pieces "like a pie" (Huffman dep. at 50:5-10), tracking the positions "of all fire

8

units at the fire scene" on a "command board" to ensure responders' safety as he delegates

9

tasks (Steele dep. at 41:10-15). The BC has full discretion over the positioning of crews,

10

resources, and techniques employed. (Griffee dep. at 30:14-19; Schuman dep. at 26:7-29:3.)

11

This also includes coordination with other agencies and departments, such as dispatch, utilities,

12

police, and media. (Griffee dep. at 43:4-21.)

13
14

> ### 2. The majority of the BC's shift hours are spent conducting training, managing personnel, and performing other supervisory functions.

15

The on-duty BC works out of one of two stations, called "battalion headquarters."

16

(Griffee dep. at 30:21-31:13; *see also* Tracy dep. at 13:8-12; Molina Decl. ¶ 2.) Each of these

17

two stations has an office reserved exclusively for the BC, in which the BC works on the

18

computer and completes other office tasks. (Griffee dep. at 33:4-10; Tracy dep. at 13:13-14:3;

19

Lines dep. at 22:21-23:13.) As Fire Chief Joe Molina describes, "[o]n a day-to-day basis, the

20

battalion chief's management of the companies under his or her command runs the spectrum of

21

initial daily staffing, to communicating with companies what the planned activities are for that

22

day, to ensuring that all activities are accomplished as assigned." (Molina Decl. ¶ 3.) This

23

includes altering assignments depending on which company is responding to a call to

24

administrative duties such as department liaison. (*Id.* ¶ 4; Tracy dep. at 11:16-12:11.)

25

At the station, BCs have additional administrative tasks such as staffing, approving

reports, reviewing employee evaluations, and communicating performance issues to

subordinates. (Olson Decl. ¶ 3; Griffee dep., dep. ex. 2 at 1-2.) BCs also run trainings to ensure

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 7
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

their crews are adequately prepared. (Steele dep. at 35:4-5.) The trainings are customized based on what the BCs believe the battalion needs to focus on that week, so they are prepared for all incidents. (*Id.* at 35:9-17.) The BCs were also responsible for "communicat[ing] the direction of the organization to the captains and firefighters, … ensur[ing] compliance with the labor contract, … [and] spend their shifts ensuring that crews are trained and prepared." (Olson Decl. ¶ 3.) BCs are "also extensively involved in officer development, spending time every quarter reviewing new policies and standard operating procedures" in addition to conducting performance evaluations of the captains." (*Id.* ¶¶ 3-4.) As Former Deputy Chief Dan Olson explains, these "management functions occupied the overwhelming majority of the Battalion Chiefs' time during their respective 24-hour shifts." (Olson Decl. ¶ 6.) By way of example, after complaining about their workloads in 2016, Plaintiffs Schuman and Steele outlined for Chief Molina the administrative work assigned to BCs, which included officer development, reviewing sick leave, reviewing response guides, post-incident reviews, and promotional interviews. (Molina Decl. ¶¶ 5-6 & Ex. 1.) These tasks were all management related. (*Id.*)

The BCs also serve extensively on interview panels used by the Fire Chief to determine which candidate should be hired and which candidate should be promoted. (*Id.* ¶¶ 13-15.) When deciding whether to hire a new candidate, the Fire Chief convenes a panel to interview candidates who ranked in the top ten of the list certified by the Civil Service Commission. (*Id.* ¶ 14.) Chief Molina has the discretion to hire any person in the top ten, regardless of score, and he does so relying on the input and suggestions from the Fire Chief's Panel. (*Id.* ¶¶ 14-15.) It is undisputed that a BC sat on this panel every time except for a few instances in the past three years when no BC was available. (Coleman Decl. ¶¶ 11-12; Molina Decl. ¶ 15.) During these panels, the members discuss each candidate and state his or her opinion as to whether the individual would succeed as a member of the Vancouver Fire Department. (Scarpelli dep. at 22:16-23:3, 23:24-24:13, 25:17-26:4; Molina Decl. ¶¶ 15-18.) Chief Molina testified that he carefully considers the comments of each panelist, including that of the BC. (*Id.* ¶ 17.) When

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 8
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

1    asked at deposition, no plaintiff could dispute the weight to which Chief Molina ascribed to the

2    battalion chiefs' input. (Schuman dep. at 73:11-74:18; Lines dep. at 45:25-49:8.) Willis, though

3    testifying that he did not "feel like there was any weight," admitted that he "d[i]dn't have a

4    clue" why he was asked to serve, and also admitting that Chief Molina "wanted … some

5    diversity on the panel as far as different levels throughout the organization" to obtain a broader

6    "perspective." (Willis dep. at 50:8-52:9.)

7            In addition to hiring panels, BCs also routinely sit on promotional interview panels with

8    the Deputy Chief of Operations. (Olson Decl. ¶ 10.) Olson testified that the BCs "had

9    significant influence in whether to promote a firefighter to the rank of captain." (*Id.*) The panel

10   would interview the top three scoring candidates from the list certified by the Civil Service

11   Commission. (*Id.*) Though the top scoring candidate typically received the promotion, the BCs'

12   presence "was essential because those two Chiefs would be on the same shift schedule as [the

13   candidate and] would have heard or seen whether there had been any problems with the

14   candidate." (*Id.*) Olson would take the panel's consensus to the Fire Chief, who would then

15   promote based on that recommendation. (*Id.*; *see also* Molina Decl. ¶ 19.) This process remains

16   true today with Chief Olson's successor, Deputy Chief Chad Michael. (Michael Decl. ¶¶ 6-7.)

17           BCs were also often assigned specific high-level departmental projects, such as

18   preparing standard operating procedures and schedule coordination. (Olson Decl. ¶ 5; Molina

19   Decl. ¶ 11.) Not surprisingly, due to their increased responsibilities and duties, BCs are

20   guaranteed a salary at least 21.5% higher than that of the highest paid captain, the rank

21   immediately subordinate to a BC. (Molina Decl. ¶ 12; Coleman Decl. ¶ 5 & Ex. 1 § 6.)

22           **B.      Well over a decade ago, the union representing the BCs negotiated a
              reduced shift-overtime rate in exchange for additional benefits, an
23            agreement that has remained unchanged ever since.**

24           For many years, the BCs have been represented by a local union. (Griffee dep. at 57:14-

25   19; *see also* Coleman Decl., Exs. 1-2.) During negotiations between the City and union leading

     up to the 2004 collective bargaining agreement ("CBA"), the union desired increased tuition

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 9
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

1   reimbursement and a higher salary over what the next lower rank (captains) made. (Coleman

2   Decl. ¶ 2 & Ex. 3 at 1-2.) From this desire, the union proposed reducing the shift overtime rate

3   from 1.5 to 1.25. (*Id*., Ex. 3 at COV004181.) Records reflect that in response to these

4   discussions, research was done to ensure the BCs could be paid at a rate less than 1.5. (*Id.*, Ex.

5   3 at COV004171-76; *see also* Baker Decl. ¶¶ 3-4; Watts Decl. ¶ 2.) The research included a

6   decision letter by the federal government, which concluded that a higher-level member of a fire

7   department was exempt. (Coleman Decl., Ex. 3 at COV004171-76.) The union's proposal was

8   eventually accepted and adopted in the 2004-06 CBA. (*Id.*, Ex. 4.) That rate of 1.25 for shift-

9   overtime has remained unchanged since that CBA was ratified in February 2004. (*Id.* ¶ 4.)

10   At no time prior to the end of 2016 did any BC suggest that the CBA violated federal

11   law. (Coleman Decl. ¶ 6; Molina Decl. ¶ 25; Watts Decl. ¶ 3; Baker Decl. ¶ 5.) Deposition

12   testimony suggested that several BCs felt as though their managerial rights diminished when

13   Chief Molina became the Fire Chief and when Chief Olson took over as deputy chief. (*See*

14   Griffee dep. at 57:10-13.) Plaintiff Tracy expounded, testifying that "the job of the battalion

15   chief changed" by "becom[ing] much more policy directed," which was in contrast to the prior

16   regime when the department acted under "axioms and guidelines," which he described as "just

17   do the best you can." (Tracy dep. at 46:19-47:20.)

18   The union representing the battalion chiefs first raised the FLSA status of the BCs in

19   late 2016, leading the City to research the issue again. This led to the conclusion, based mostly

20   on the expressed opinion of the Department of Labor, *see* 2005 DOL Opinion Letter, *supra*,

21   that battalion chiefs whose primary duty was management were in fact exempt. (Coleman Decl.

22   ¶ 7; Molina Decl. ¶ 25.)

23   Unsatisfied with the City's response, the Plaintiffs filed suit on May 31, 2017. (Dkt. 1.)

24

25

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 10
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

1

### III.  ISSUES PRESENTED

2
  (1)  Whether Plaintiffs as VFD Battalion Chiefs, are exempt from the FLSA

3
overtime rules as highly compensated employees, as defined by the DOL, because they (a)

4
undisputedly meet the salary requirement; (b) undisputedly perform at least one management

5
duty every week; and (c) undisputedly perform office and non-manual management functions

6
as their primary duty of managing their battalions.

7
  (2)  Whether, in the alternative, the BCs are exempt under the traditional bona-fide

8
executive test from 29 C.F.R. § 541.100, when (a) their salary exceeds the minimum threshold,

9
(b) their primary duty is management, (c) they customarily and regularly supervise at least two

10
subordinates, and (d) their duties include sitting on a Chief's Panel tasked with conducting final

11
interviews of firefighter and/or promotional candidates, the suggestions from which guide the

12
Chief to make conditional offers of employment and promotions, thus confirming that their

13
input is given "particular weight."

14
  (3)  Whether, if a jury must decide one element, the Court should determine as a

15
matter of law those elements that Plaintiffs do not or cannot dispute.

16
  (4)  Whether, at a minimum, Plaintiffs Tracy and Huffman were exempt as

17
administrative employees and/or combination employees during their temporary assignments as

18
Acting Deputy Chief of Administration and Acting Division Chief of Training.

19
  (5)  Whether, if a trial is needed to determine the Plaintiffs' exempt status, the two-

20
year statute of limitations precludes liability for any action taken prior to May 31, 2015,

21
because no reasonable fact finder would conclude that the City knew or showed reckless

22
disregard for the matter of whether its conduct violated the FLSA.

23

### IV.  ARGUMENT AND AUTHORITY

24
  Summary judgment is proper when "there is no genuine dispute as to any material fact

25
and the movant is entitled to judgment as a matter of law." FRCP 56(a); *see also Celotex Corp.*
*v. Catrett*, 477 U.S. 317, 322 (1986). Issues of fact, though normally reserved for the jury, are

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 11
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

1 determined by the court as a matter of law when reasonable minds cannot differ. *Johnson v.*

2 *Hawe*, 388 F.3d 676, 683 (9th Cir. 2004). The non-moving party cannot avoid summary

3 judgment by providing a mere scintilla of evidence. *Arpin v. Santa Clara Valley Transp.*

4 *Agency*, 261 F.3d 912, 919 (9th Cir. 2001). Rather, "summary judgment should be granted

5 where the nonmoving party fails to offer evidence from which a reasonable jury could return a

6 verdict in [his] favor." *Triton Energy Corp. v. Square D Co.,* 68 F.3d 1216, 1221 (9th Cir.

7 1995). To avoid summary judgment, the nonmoving party must present specific, significant

8 probative evidence, not simply "some metaphysical doubt." *Matsushita Elec. Indus. Co. v.*

9 *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also* FRCP 56(c)(1)(A). A party cannot

10 avoid summary judgment by stating that an intent to discredit the movant's evidence at trial.

11 *T.W. Elec. Serv., Inc. v. P. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

12 Conclusory, nonspecific statements are not sufficient, and missing facts are not presumed.

13 *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

14       Plaintiffs each raise a single cause of action, namely that the City violated the FLSA by

15 paying them the collectively bargained rate of 1.25 instead of 1.5 for shift overtime work. (Dkt.

16 18 ¶¶ 17-25.) The dispositive issue is whether these Plaintiffs, during their time as VFD

17 battalion chiefs, were exempt from the FLSA's overtime provisions. If the Plaintiffs were

18 exempt, they are not entitled to any additional overtime, and the complaint must be dismissed.

19 29 U.S.C. § 213. As explained below, they were exempt.

20       In the alternative, the Court should narrow the issues to be decided at trial as follows.

21 First, it should decide as a matter of law those elements that the Plaintiffs cannot genuinely

22 dispute. Second, it should confirm that the time spent by Plaintiffs Tracy and Huffman during

23 their out-of-class assignments, which undisputedly occurred almost exclusively in an office

24 environment and which vested them with enormous discretion on matters of significance,

25 rendered them exempt under the administrative and executive exemption and/or combination

thereof. And finally, because the Plaintiffs cannot produce sufficient evidence to raise a

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 12
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

genuine dispute as to whether the City willfully violated any Plaintiff's FLSA rights, the Court should eliminate any basis to claim an FLSA violation that occurred prior to May 31, 2015.

### A.    Background of FLSA, its exemptions, and DOL's interpretive role.

To properly explain why the Plaintiffs while serving as Vancouver BCshave always been and continue to be exempt, it is necessary to discuss the background of the exemptions and the Department of Labor's role in interpreting them.

Recognizing that unfair and unsafe labor conditions affect the whole of interstate commerce and intending to rectify "conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers," Congress enacted the FLSA 80 years ago. The provisions pertinent to this suit promise that non-exempt employees will be paid 1.5 times their normal rate for each hour of "overtime" that they work in a given workweek. 29 U.S.C. § 209(a)(1). In answers to Requests for Admission, Plaintiffs agreed that the City properly calculated the number of shift overtime hours worked during the three years preceding the complaint. (*See* Lloyd Decl., Exs. I (RFA Nos. 1-8).) That issue is therefore "conclusively established." FRCP 36(b). Consequently, the only issue is whether the contractually agreed upon 1.25 rate applies, which hinges on whether the City properly classified the battalion chiefs as exempt.

The FLSA limits the class of employees entitled to overtime protection, exempting "bona fide executive, administrative, [and] professional" employees from coverage. 29 U.S.C. § 213(a)(1). Congress provided no further context, instead "grant[ing] the Secretary [of Labor] broad authority to 'define and delimit' the scope of the exemption for executive, administrative, and professional employees." *Auer v. Robbins*, 519 U.S. 452, 456 (1997) (quoting 29 U.S.C. § 213(a)(1)). Effectuating this task, the DOL codified numerous regulations describing how to properly decide whether a given employee or group of employees are exempt under § 213(a)(1). *See* 29 C.F.R. §§ 541.100-300; 541.601(a); 541.708.

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 13
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

As the Ninth Circuit has explained, "[a] proper interpretation of the FLSA is necessarily guided by the [DOL] regulations." *Christopher v. SmithKline Beecham Corp.*, 635 F.3d 383, 389 (9th Cir. 2011). These "interpretations and opinions of the [Secretary] under [the FLSA], … constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore v. Swift & Co.*, 323 U.S. 134, 139 (1944). The DOL's interpretation of Part 541, "a creature of the Secretary's own regulations," is also "controlling unless plainly erroneous or inconsistent with the regulation." *Auer*, 519 U.S. at 461 (quotations omitted); *accord Bratt v. County of L.A.*, 912 F.2d 1066, 1070 (9th Cir. 1990).

Where FLSA overtime is concerned, the employer bears the burden of proving the exemption applies. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974). For many years, the Ninth Circuit required that FLSA exemptions be construed narrowly, but the Supreme Court squarely rejected that approach earlier this year. *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018). Rather, as *Encino Motorcars* made clear, exemptions are to be given "a fair interpretation" without any presumption of a narrow construction. *Id.*

The two versions of the § 213(a)(1) exemption proffered here are defined in 29 C.F.R. § 541.100 and 541.601. The City asserts that each Plaintiff, as a battalion chief, satisfies the DOL's definition of both a HCE under 29 C.F.R. § 541.601 and a bona-fide executive under § 541.100, either of which is sufficient grounds to reject Plaintiffs' single cause of action.

**B.    Vancouver Fire Department Battalion Chiefs meet the DOL's definition of HCEs because they are highly compensated, perform management duties weekly, and their primary duty is management which includes office and/or non-manual labor.**

The HCE test, as its name indicates, focuses on the employee's "high level of compensation [as] a strong indicator of an employee's exempt status," instead of a rigid application of the executive, administrative, and/or professional tests. 29 C.F.R. § 541.601(c). The HCE test is lenient by design, intending to streamline and "relax the duties" analysis for certain individuals who ranked in the top percentiles of income earners in the country. *Anani v. CVS RX Servs.*, 730 F.3d 146, 150 (2d Cir. 2013); *see also* 29 C.F.R. § 541.601(c) (noting an

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 14
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

employee whose salary qualifies and "customarily and regularly directs the work of two or more other employees," may be an exempt executive without any other elements of § 541.100(a) present).[3]

A HCE under § 541.601 is an employee who (a) makes over $100,000 in annual compensation prior to 2016 and over $134,004 from 2016 to the present, and (b) "customarily and regularly perform *one or more* of the exempt duties . . . of an executive," which includes "management" duties. 29 C.F.R. § 541.601(a)(1)-(2) (emphasis added); *see also id.* § 541.102 (defining management duties). An employee who meets these two elements "shall be exempt under" 29 U.S.C. § 213(a)(1). 29 C.F.R. § 541.601(a). However, the DOL limited the regulation's scope to only those employees whose "primary duty includes office or non-manual labor." *Id.* § 541.601(d). Thus, if an employee meets the two elements of § 541.601(a), and his or her "primary duty includes office or non-manual labor," the exemption applies and the employee is not entitled to overtime. *Id.* § 541.601 (citing 29 U.S.C. § 213(a)(1)).

### 1. The Plaintiffs easily and undisputedly satisfy the first two elements of the HCE test.

Plaintiffs, while serving as VFD battalion chiefs, undisputedly satisfy both elements of § 541.601. It is conclusively established that Plaintiffs made the requisite threshold of at least $100,000 in total annual compensation up through December 1, 2016, and $134,004 annually thereafter. *See* Former 29 C.F.R. § 541.601(a) (2004), *followed in Anani*, 730 F.3d at 150; 29 C.F.R. § 541.601(b); (*see also* Lloyd Decl. Ex. I (RFAs 9-69).); FRCP 36(b).

The second element requires the City to show only that the Chiefs perform "*one or more* of the exempt [management] duties" found in § 541.102. 29 C.F.R. § 541.601(a) (emphasis added). DOL defines "management" duties to include:

> interviewing, selecting, and training of employees; . . . directing the work of
> employees; . . . planning the work; determining the techniques to be used;

---

[3] As explained *infra* Part IV.C, Plaintiffs are also exempt under the traditional executive test. The City, however, proceeds initially under the HCE test because it is more straightforward.

apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; . . . and monitoring or implementing legal compliance measures.

*Id.* § 541.102. Plaintiffs need only perform one of these duties at "a frequency that [is] greater than occasional but which, of course, may be less than constant." 29 C.F.R. § 541.701 (defining "customarily and regularly"). Tasks that are "normally and recurrently performed every workweek" meet this definition. *Id.* According to their own testimony, the BCs' most important duties are to keep their crews safe and provide training to that effect. (Hazelton dep. at 15:24-25, 16:1-5; Huffman dep. at 13:5-18; Lines dep. at 19:11-17.) The regulations make clear that "providing for the safety and security of" employees is a management duty. 29 C.F.R. § 541.102. Furthermore, each Plaintiff affirmed that every shift began by coordinating scheduling and ensuring that their battalions were appropriately staffed. (Steele dep. at 13:20-25; Tracy dep. at 21:10-20, 27:5-28:15; Hazelton dep. at 10:4-11:24; Lines dep. at 14:11-16:17, 21:3-23:6; Schuman dep. at 11:4-12:18; Griffee dep. at 33:8-35:6; Willis dep. at 14:12-17:16, 18:15-21:23.) The regulations make clear that staffing is a management duty. 29 C.F.R. §541.102; *see also Haines v. S. Retailers*, 939 F. Supp. 441, 447-48 (E.D. Va. 1996) (holding "staffing" was a management duty). Undisputedly, each Plaintiff "customarily and regularly" performs management functions, which satisfies the second HCE element.

> **2.** **So long as the fire department employee's primary duty is management, which is the case here, the first responder regulation does not compel the nonexempt status of a battalion chief.**

Despite the straightforward application of § 541.601, Plaintiffs claim that they cannot be exempt because of the "first responder" regulation found at 29 C.F.R. § 541.3(b), which provides in relevant part: "fire fighters, paramedics, emergency medical technicians, ambulance personnel, rescue workers, … [and] similar employees, regardless of rank or pay" are not exempt under 29 U.S.C. § 213(a)(1). 29 C.F.R. § 541.3(b)(1). Myopically, Plaintiffs claim that because they are members of a fire department whose duties include emergency response

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 16
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

necessarily precludes any finding that they are exempt. Not only has the DOL rejected this sort of selective reading, the courts have soundly rebuked it as well. *E.g., Morrison v. County. of Fairfax*, 826 F.3d 758, 766-67 (4th Cir. 2016) (discussed *infra*). Rather, as explained below, the "first responder" regulation presumes that if a first responder's primary duty is not management, he or she is not exempt. Conversely, if the employee's primary duty *is* management, the responder regulation ceases to apply.

> **a.    DOL regulations and the agency's interpretation thereof, all of which are entitled to judicial deference, provide that a high-ranking member of a fire department whose primary duty is management may still be exempt as an HCE.**

When the DOL passed § 541.3 in 2004, it did so under the premise that the "the primary duty" of those types of first responders listed "*is not management* of the enterprise in which the employee is employed . . . as required under § 541.100." 29 C.F.R.. § 541.3(b)(2) (emphasis added). Conversely, if the "primary duty" of a higher-level fire department official "is … management," *id.*, the rationale for categorically excluding a fire department employee from exempt status evaporates. A 2005 Opinion Letter from the DOL confirms just that. *See* 2005 DOL Opinion Letter, *supra* at 2. Specifically, DOL concluded that fire battalion chiefs are "exempt from the minimum wage and overtime provisions of the FLSA" if their duties qualify them for an exemption. *Id.* at 3. This opinion letter is entitled to controlling judicial deference. *Miller v. Farmers Ins. Exch.*, 481 F.3d 1119, 1127 (9th Cir. 2007).

The rationale behind this conclusion stems from the DOL's comments when it promulgated § 541.3(b). It first noted that a "fire fighter whose *primary duty* is to . . . fight fires is not exempt under section 13(a)(1) of the [FLSA] merely because the . . . fire fighter *also* directs the work of other employees *in the conduct of* . . . *fighting a fire.*" Defining & Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales & Computer Employees, 69 Fed. Reg. 22122, 22129 (Apr. 23, 2004) (emphasis added). However, the DOL further stressed that "high-level … fire officials" can be "exempt executive or administrative employees … if … their primary duty is performing managerial tasks." *Id.* at

22130. In fact, the DOL explained that such "managerial tasks" include the exact duties Plaintiffs undisputedly discharge when fulfilling their role as incident commanders: "ensuring operational readiness through supervision and inspection of personnel" as well as "*directing operations at ... fire or accident scenes*, including whether additional personnel or equipment is needed." *Id.* (emphasis added). Furthermore, the DOL noted that prior to § 541.3(b), federal courts often arrived at the correct classification for exempt and nonexempt first responders by applying the primary duty test. *Id.* at 22129. Section 541.3(b) was not meant to encourage "depar[ture] from this established case law." 69 Fed. Reg. at 22129. Instead, the DOL intended to clarify a "more stringent" primary duty test "for police officers, fire fighters, . . . [and] other first responders." *Id.* at 22195. This signals that the employee's primary duty governs whether § 541.3(b) has any application in a given case.

The construction of Part 541 further demands a structural inference that employees whose primary duty is management are exempt. Had the DOL intended to foreclose the possibility that a high level fire fighter would be exempt, it would have used the language "first responder" in the regulation to more broadly encompass any department member who responded to calls. By way of illustration, 29 C.F.R. § 541.3(a), promulgated contemporaneously with § 541.3(b), clarifies comprehensively that the "manual laborers" who "perform work involving repetitive operations with their hands, physical skill and energy" retain their non-exempt status. *Id.* Conversely, § 541.3(b) limits application by the *type* of work the fire fighter performs, stating that non-exempt responders must "perform work such as ... extinguishing fires ... [or] rescuing ... victims." *Id.* § 541.3(b)(1). This limitation invites the strong inference that the Court must apply the primary duty test to determine whether a fire fighter performs § 541.3(b) work.

The applicability of the primary duty test is echoed in other regulations as well. 29 C.F.R. § 553.216 explicates that municipalities like the City of Vancouver may "claim[]" an "exemption ... for any fire protection or law enforcement employee who meets all of the tests

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 18
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

1  specified in part 541 relating to duties, responsibilities, and salary." *Accord* 29 C.F.R. § 541.2

2  ("exempt or nonexempt status of any particular employee must be determined on the basis of

3  whether the employee's salary and duties"). Courts must harmonize these sections with

4  § 541.3(b). *Pac. First Fed. Sav. Bank v. Comm'r*, 961 F.2d 800, 803-04 (9th Cir. 1992);

5  *Wileman Bros. & Elliott, Inc. v. Giannini*, 909 F.2d 332, 336-37 (9th Cir. 1990).

6       Section 541.3(b) does not impart any intent to discontinue the primary duty test; quite

7  the opposite, and applying the primary duty test would not create an absurd result. Even if the

8  Court finds that § 541.3(b) expresses a mild intent to change the focus of the primary duty test,

9  the Court "cannot rely on this vague suggestion of intent to rationalize or disregard the clear

10 language of the regulation[s]." *Wileman Bros.*, 909 F.2d at 336. The DOL, aware of the

11 question, has made no effort to rescind or change the aforementioned sections that require the

12 Court to determine the employee's primary duty.

13                **b.    Case law has embraced the position of the DOL to limit
                       application of the "first responder" regulation to those whose
14                     primary duty is fighting fires on the front lines rather than in
                       command away from the emergency**.

15      The interpretation of § 541.3(b) that focuses on the employee's primary duty test further

16 supported by the DOL's *amicus curiae* briefing, a form entitled to judicial deference. *Auer*, 519

17 U.S. at 462; *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 171 (2007) (noting that

18 where the DOL's "interpretation of its own regulation reflects it considered views . . . [,] we

19 have accepted that interpretation as the agency's own, even if the agency set those views forth

20 in a legal brief"). As *amicus*, the DOL has taken the position that, as with any other class of

21 employee, the relevant inquiry for a first responder is whether the employee's primary duty is

22 management. *E.g. Mullins v. City of New York*, 653 F.3d 104, 114-15 (2nd Cir. 2011).[4]

23 ─────────────────

24 [4] The Ninth Circuit has not yet been presented with the opportunity to resolve this question. At least two district courts within this circuit have considered similar questions, however, and have applied the primary duty test to

25 employees named in § 541.3(b). *See e.g. Nigg v. U.S. Postal Servs.* ,829 F. Supp. 2d 889, 906-07 (C.D. Cal. 2011) (referring to a DOL opinion letter to find that the § 541.3(b) exception did not prevent application of the "primary duty" test to post-office inspectors), *aff'd*, 2013 U.S. App. LEXIS (9th Cir. Nov. 13, 2013); *McCoy v. N. Slope Borough*, 2013 U.S. Dist. LEXIS 121797, *35-35 n.92 (D. Alaska Aug. 26, 2013) (noting that the application of "primary duty" test to search and rescue pilots and coordinators is consistent with the direction of § 541.3(b)).

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 19
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

*Mullins* involved claims by New York police sergeants seeking payment for shift overtime. 653 F.3d at 105. The sergeants argued that they could not be exempt executives due to § 541(b); the DOL joined as *amicus*, supporting the sergeants' position. The DOL explained that "the new first responder regulation does not purport to make all police officers non-exempt; the determining factor *remains their primary duty*." *Id.* at 110. (quotation marks omitted) (emphasis added). Because the sergeants only "direct[ed] the work of subordinate officers while performing [their emergency] duties," and "[s]uch supervision does not constitute the type of management that . . . would satisfy" the primary duty test, the sergeants were held non-exempt under § 541.3(b). *Id.* The DOL distinguished the sergeants' claims from those "involv[ing] the high-level direction of operations by fire chiefs and fire captains who generally d[o] not engage in any front-line firefighting," noting the latter (like these Plaintiffs) would not fall under § 541.3(b). *Id.* at 115. Finding that the DOL interpretation was consistent with the plain statutory language and previous agency interpretations, the court deferred to the DOL, holding that § 541.3(b) must be prefaced by the primary duty test. *Id.* at 114-15.

*Morrison*, 826 F.3d 758, is also instructive. There, the DOL joined again as *amicus* to assist the court's interpretation. The plaintiffs, captains in the Fairfax County Fire Department, claimed they were non-exempt employees because they were "'fire fighters who 'perform work such as preventing, controlling, or extinguishing fires.'" *Id.* at 766 (quoting § 541.3(b)(1)). Quoting the DOL *amicus* brief, the court held that the first responder regulation "remains 'grounded in first responders' primary duty,'" emphasizing that "certain high-level … fire officials <u>are</u> exempt because their primary duty is performing managerial tasks." *Id.* at 766-67. (emphasis in original). Thus, according to *Morrison*, when the primary duty is *not* "firefighting and emergency aid," but rather is management, the fire department employee can be properly classified as an exempt HCE. *Id.* at 773 n.11.

In terms of defining what is "managerial" and what is not, *Maestas v. Day & Zimmerman, LLC*, 664 F.3d 822, 829 (10th Cir. 2012), is also helpful. Pointing to the DOL's

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 20
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

comments when it promulgated § 541.3, and specifically the agency's description of "managerial" tasks, the *Maestas* court wrote:

> On one hand, directing the work of subordinates *while simultaneously performing first responder activities* does not qualify as a managerial duty. On the other hand, '*directing operations' at an emergency scene is a managerial duty*. The distinction appears to hinge on *whether the supervisors engage in the same front-line activities as their subordinates on a daily basis*.

*Maestas v. Day & Zimmerman, LLC*, 664 F.3d 822, 829 (10th Cir. 2012) (emphasis added). These authorities confirm that when a supervisor in a fire department "engage[s] in the same front-line activities as [his or her] subordinate on a daily basis," the act of directing the subordinate's work at an emergency scene is nonexempt work. *Id.* But conversely, when the supervisor does not "on a daily basis" perform "the same front-line activities" as firefighters, the supervisor's "'directing [of] operations' at an emergency scene is a managerial duty," and consequently, exempt duty. *Id.* (quoting 69 Fed. Reg. 22130)

   *Rooney v. Town of Groton*, 577 F. Supp. 2d 513 (D. Mass. 2008), *report & recommendation adopted by* 2008 U.S. Dist. LEXIS 106453 (D. Mass. Sept. 17, 2008), properly illustrates this rule. *Rooney* involved a claim for unpaid overtime by a police lieutenant who, like the Plaintiffs here, had some duties commensurate with a line-level police officer, such as search warrant execution, court testimony, and traffic stops. *Id.* at 521. However, as is the case here, the plaintiff's duties were overwhelmingly management related, such as serving as critical incident commander, reviewing reports, recommending how officers could improve reports, and ordering additional personnel to work. *Id.* at 522. Additionally, like these Plaintiffs, the plaintiff in *Rooney* participated in the hiring process by acting "as a member of an interview panel, rank[ing] applicants on their suitability for the position, discuss[ing] the merits of applicants." *Id.* And like the Plaintiffs here, he claimed that the Chief made promotional or hiring decisions "without placing weight on [his] comments." *Id.* (brackets in original). The court rejected the plaintiff's arguments and granted summary judgment to the Town, reasoning that his primary duty was unquestionably management

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 21
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

because "[h]e makes judgment calls regarding work that subordinates are to perform, exercises discretion in directing the work of subordinate employees, supervises employees under him, and has the authority to order additional police personnel to work." *Id.* at 526. Additionally, the court turned to the job description to note that the majority of duties listed were management related, *id.* at 527-28, and highlighted the fact that "[t]he plaintiff supervises patrol officers, … is in charge during the Chief's absence, … is mainly free from the Chief's supervisions, and … is compensated more generously consequent to the responsibilities accompanying the position," *id.* at 529. Turning to the plaintiff's argument that § 541.3(b) negated the Town's ability to claim the executive exemption, the *Rooney* court aptly said "at a certain level of abstraction, all police officers could be viewed as first responders. However, such a perspective would undermine the Department of Labor's specifically stated intent not to depart from established case law." *Id.* at 536. Rather, *Rooney* held that the proper inquiry lies in whether the plaintiff's duties and salary meet the applicable tests for the exemptions. *Id.*

*Rooney*'s analysis squarely applies here. The critical question is not whether Plaintiffs respond to some calls when dispatched. Rather, the critical inquiry is whether their primary duty is management. *Accord Martinez v. Refinery Terminal Fire Co.*, 2014 U.S. Dist. LEXIS 18244, at **9-16 (S.D. Tex. Feb. 13, 2014) (granting summary judgment to employer of "shift captains" in non-profit fire department, holding primary duty was management). Applying the primary duty test to these Plaintiffs, as the DOL instructs the Court to do, confirms that the BCs' primary duty is management. And because that primary duty includes office and/or non-manual labor, they are exempt as a matter of law. 29 C.F.R. § 541.601.

> **3.    A VFD battalion chief's primary duty is management, which is predominated by office work and non-manual labor, thereby confirming application of the HCE exemption.**

The record reveals that although each Plaintiff had unique responsibilities assigned to him during each individual's time as a BC, "job duty does not fluctuate" from BC to BC. (Michael Decl. ¶ 2; *see also* Molina Decl. ¶ 2 ("Although their individual responsibilities may

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 22
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

vary from battalion chief to battalion chief (as determined by, for example, what projects are assigned to him or her, …), the duties of the battalion chief are identical across the board.").) Thus, whether the BC's primary duty is management is a question universally applicable to each of the eight Plaintiffs.

"The term 'primary duty' means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700. When asked at deposition, the Plaintiffs testified that their most important job was "[p]reparing for and being ready to respond to emergencies" (Tracy dep. at 45:16-19), which included ensuring "the safety of the firefighters and responders" (Huffman dep. at 13:5-7); (*see also* Hazelton dep. at 15:22-16:3 ("My primary responsibility was -- to is make sure my crews are operating safely out at emergency scenes.") Rather than accept any party's self-serving description, the Court must place "the major emphasis on the character of the employee's job as a whole," 29 C.F.R. § 541.700, particularly when incident response comprised less than three percent of their time (Beaton Decl., Ex. 1 (Sch. 12)).

"[W]hether … particular activities exclude[] [an employee] from the overtime benefits of the FLSA" is a question of law. *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986). Stated another way, it is for the court to determine, as a matter of law, whether a specific duty is exempt work or nonexempt work. *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1124 (9th Cir. 2002). In approaching the "primary duty" analysis, courts consider:

> (1) the relative importance of the exempt duties as compared with other types of duties; (2) the amount of time spent performing exempt work; (3) the employee's relative freedom from direct supervision; and (4) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

29 C.F.R. § 541.700(a). Applying these four factors to the present case confirms the battalion chiefs', and consequently Plaintiffs', "primary duty" is management.

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 23
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

1

2

          a.       **Serving as incident commander is a management duty where, as here, the overwhelming majority of time is not spent contemporaneous to traditional first responder duties.**

3

    Plaintiffs contend that their role as incident commander as the most critical component

4

of their job. (Griffee dep. at 15:9-14, 44:14-16; Tracy dep. at 17:17-19:25; Huffman dep. at

5

68:7-11; Schuman dep. at 29:7, 31:19-23; Hazelton dep. at 24:21-25:25; Lines dep. at 11:20-

6

14:4; Steele dep. at 64:21-23; Willis dep. at 30:24-31:2.) Thus, for purposes of this motion, if

7

the Court were to assume incident response and the preparation therefor was the Plaintiffs'

8

most important duty, the question becomes whether that is exempt work. Again, this is a

9

question of law. *Icicle Seafoods*, 475 U.S. at 714; *Bothell*, 299 F.3d at 1124.

10

    It must be remembered that unless the BCs engage in the same kind of front-line

11

activities as firefighters "on a daily basis," their duties as incident commander remain

12

managerial. *Maestas*, 664 F.3d at 829; 69 Fed. Reg. at 22130. The Plaintiffs' description of

13

how they approach the incident commander role confirms its exempt status. Every plaintiff

14

confirmed that it is a rarity that a battalion chief would perform traditional firefighting duties

15

simultaneously with directing operations. (Griffee dep. at 43:22-45:15; Hazelton dep. at 25:19-

16

26:8; Lines dep. at 29:3-4, 39:17-40:23; Tracy dep. at 18:18-20:16; Schuman dep. at 31:16-

17

34:17; Huffman dep. at 27:15-29:22; Willis dep. at 37:13-38:5; Steele dep. at 26:19-28:24.)

18

Rather, on the typical incident response, Plaintiffs served as incident commander from their

19

assigned sport-utility vehicle, and would not don the full turnout gear. (Steele dep. at 27:4-6;

20

Michael Decl. ¶ 4.) Unlike crew fire fighters and captains, the BC manages the resources from

21

his command vehicle but does not physically assist in putting out the fire. (Griffee dep. at

22

45:12-15 ("[My] job is to supervise the crews. . . . So [I] would be in that environment, but [I]

23

would not actually be doing the swinging [of an ax to chop down a door] or spraying [water on

24

the fire to stop it].");  *see also* Hazelton dep. at 26:5-8; Lines dep. at 29:3-4.) While serving as

25

incident commander, the BC "provide[s] an overarching example of how [he] want[s] to fight

the fire," (Griffee dep. at 81:9-11), and then "coordinat[es] the tactics, implement[s] the

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 24
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

strategy" (Huffman dep. at 14:6-8). Similarly, Tracy testified that as incident commander he "direct[s] the activities of the incoming fire trucks and engines." (Tracy dep. at 19:20-21.) Other plaintiffs offered nearly identical testimony. (Griffee dep. at 43:4-21; Lines dep. at 29:1-12; Steele dep. at 27:2-28:24; Hazelton dep. at 17:20-23, 23:18-26:14; Schuman dep. at 31:16-36:13; Willis dep. at 30:23-32:7.) Where, as here, the supervisor managing first responders does not "on a daily basis" engage in the same type of front-line activities as those first responders, that work remains exempt. *Maestas*, 664 F.3d at 829. And even if a BC were to gear up and join the crew to effectuate a rescue or to stop a fire, the BC's "primary duty" would remain management: "An employee may perform exempt managerial duties concurrently with nonexempt work as part of their general duties without losing their exempt status." 29 C.F.R. § 541.106(a), (c).

The regulations make clear that "providing for the safety and security of the employees" and directing work are exempt management functions. 29 C.F.R. § 541.102. Each Plaintiff confirmed that these functions are central to the BC's job. (*See* Griffee dep. at 15:9-11 ( "sole responsibility on duty is to ensure the safety of the firefighters and the community"); Hazelton dep. at 15:24-25 ( "primary responsibility . . . is to make sure [the] crews are operating safely out at emergency scenes"); Huffman dep. at 13:5-7 ("my primary duty" is "to protect the safety of the firefighters and responders during emergencies"); Lines dep. at 19:12-13 (the "most important duty" is to keep his crews "safe on shift every day. [BCs] are responsible for their safety at big fires"); Schuman dep. at 32:24-25; 33:7-8 (the "incident commander" is "the on-scene safety officer" and "oversee[s] the safety of every person as well as civilians on the scene"); Steele dep. at 64:21-23 (the incident commander's role "is the safety of [the] crew and making sure that [they are] operating efficiently and safe[ly]"); Tracy dep. at 18:15-16 (responsibility is to "[c]ontrol the [crews] working within the hazard zone of an incident scene"); Willis dep. at 30:24-31:2 ("The incident commander is the ultimate in the responsibility of everybody on the scene, in charge of safety, in charge of just the whole

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 25
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

1  outcome of the scene. They're the ultimate responsibility."). The Fire Chief and Deputy Chiefs

2  also understand the BCs to be management. (Molina dep. at 23:9-10; Koellemeier dep. at

3  72:17-22 (BCs are considered "leaders" who direct at the "organizational level" and act as

4  "extension[s] of the chief office"); Michael Decl. ¶¶ 2, 4.)

5        Front line response is incidental for a BC; BCs always expect to take control of an

6  incident, and are unlikely to put on full "turnouts" and join crews on the front lines. (*Accord*

7  Steele dep. at 27:4-6.) And in the "less frequent" situation in which multiple BCs respond to a

8  scene (Lines dep. at 33:25), they either take over as "division supervisor" for a portion of a

9  large fire, positioning themselves to direct the operations of crews working in a subset of the

10  overall incident (Michael dep. at 84:7-10; Lines dep. at 31:2-6), or the second arriving BC may

11  determine he is not needed and leave the scene (Tracy dep. at 20:4-6). That the BC has the

12  discretion to leave a scene where he is not needed, instead of gearing up and reporting (Michael

13  Decl. ¶ 4), supports the conclusion that his primary duty is management.

14        In short, BCs are not called to fight fires, but rather to oversee the response, direct

15  operations, and promote safety. These are quintessential management functions, 29 C.F.R.

16  § 541.102, and remain exempt because the BCs do not on a daily basis engage in front-line

17  activities. Their duties fall squarely within the DOL's description: "certain managerial tasks

18  such as '*directing operations at … fire or accident scenes*' when performed by *high-level*

19  *personnel who typically d[o] not engage in any front-line activities* would still be considered

20  'management.'" *Mullins*, 653 F.3d at 116 (emphasis added). This interpretation is entitled to

21  controlling deference. *Auer*, 519 U.S. at 461-62. It is exempt work. 69 Fed. Reg. at 22130.

22              **b.    Plaintiffs, as battalion chiefs, spend the majority of their time**
                        **performing exempt, management work**.

23        The remote possibility that a battalion chief might engage in front-line duties does not

24  alter their primary duty. "[E]mployees who spend more than 50 percent of their time

25  performing exempt work will generally satisfy the primary duty requirement." 29 C.F.R.

§ 541.700(b). Management can still be the primary duty even if an employee spends less than

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 26
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

1    half the time on such tasks. *Id.* But where, as here, an employee actually spends more than 50

2    percent of his or her time on management functions, management is the primary duty. *Id.*

3         It is undisputed that the Plaintiffs spent less than three percent of their time responding

4    to calls. (DeVore Decl., Ex. 1; Beaton Decl., Ex. 1 (Sch. 12).) And by the Plaintiffs' own

5    testimony, it was the exception on those calls that they would be required to don the full turnout

6    gear and engage in any sort of work that would be considered nonexempt. (Lines dep. at 33:13-

7    15; *see also* Hazelton dep. at 26:5-14.) Rather, as stated above, Plaintiffs testified that they

8    would spend a large portion of their day training their subordinates, which is by definition a

9    management function. 29 C.F.R. § 541.102.

10        The job description further identifies "participate in the training of personnel and serve

11   as an instructor for specialized in-service training courses; implement assigned training as

12   directed" as essential functions of the job. (Griffee dep., dep. ex. 2; *see also* Tracy dep. at 10:5-

13   11, 53:7-55:3, 57:3-9 & dep. ex. 1.) Every plaintiff identified training a major component of the

14   job, including some (e.g., Tracy, Lines), who testified that it covered the majority of their time,

15   ensuring that firefighters and captains were appropriately trained. (Griffee dep. at 37:12-38:6;

16   Tracy dep. at 26:21-27:4; Schuman dep. at 18:2-19:14, 99:16-100:4); Huffman dep. at 30:8-16;

17   Lines dep. at 13:2-5, 16:19-17:25; Hazelton dep. at 11:10-12:19, 13:25-16:19; Steele dep. at

18   17:22-18:19, 19:15-18; Willis dep. at 40:11-43:6.) Plaintiff Lines testified that 80 percent of his

19   day was spent on training (Lines dep. at 16:22-17:6), and Plaintiffs Tracy, Huffman, and

20   Griffee each testified that half of that time was spent administering the training (Huffman dep.

21   at 30:8-16; Tracy dep. at 26:24-27:4; Griffee dep. at 37:24-38:6), whereas Plaintiff Schuman

22   testified it was "50/50 or less" (Schuman dep. at 19:12-13). Hazelton testified that "a large part

23   of what … my responsibility was, being sure that all the crews have good training." (Hazelton

24   dep. at 15:19-21.)

25        The Plaintiffs' other duties also fell on the management side of the ledger. Every

     Plaintiff identified staffing as typical duty. (Steele dep. at 13:20-25; Tracy dep. at 21:10-20,

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 27
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

27:5-28:15; Hazelton dep. at 10:4-11:24; Lines dep. at 14:11-16:17, 21:3-23:6; Schuman dep. at 11:4-12:18; Griffee dep. at 33:8-35:6; Willis dep. at 14:12-17:16, 18:15-21:23.) As Huffman testified, "Staffing was probably the most consistent important thing to do for the next day. That could take a while." (Huffman dep. at 21:17-19.) BCs would review staffing every day at the beginning of each shift (Steele dep. at 13:20-25, 14:1-3), to ensure the minimum number of personnel are on hand in the event of an emergency (*id.* at 14:4-9).

Additionally, the BC is responsible for shifting responsibilities between stations whenever one company is unavailable. (Molina Decl. ¶ 3; *see also* Tracy dep. at 11:12-22, 13:16-14:3.) Other management duties include "ensuring that daily recruit evaluations are completed." (Molina Decl. ¶ 4.) These other duties—conducting interviews, evaluating subordinates, and working on department policies, all of which were done undisputedly by these Plaintiffs (*e.g.*, Olson Decl. ¶ 5; Molina Decl. ¶¶ 5-6 & Ex. 1)—are also plainly management functions. 29 C.F.R. § 541.102.

Perhaps the only nonexempt work performed by the Plaintiffs was maintaining their certifications in the unlikely event their services would be needed alongside a subordinate firefighter. But preparing for the remote possibility of the highly-unlikely weighed far below the typical work day and management duties. Thus, when comparing exempt duties versus nonexempt duties, the scales tip heavily in favor of management. As Plaintiff Willis aptly said:

> Q.  Would you agree that whether you are on scene in a station or in training, *your primary job is to manage or supervise your battalion*?
>
> A.  The captains in my battalion. They're who I'm in charge of. *Yes.*

(Willis dep. at 28:11-15 (emphasis added); *see also* Hazelton dep. at 17:10 ("It is a supervisory position, so I'm supervising my crew on scene. Yeah. I guess in some aspect, you know, managing them in certain aspects."); Griffee dep., dep. ex. 2 ("This is a management level position.").) As former Deputy Chief Olson explained, the management duties of the BC, such as policy development, performance appraisals, ensuring subordinates completed incident

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 28
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

1  reports, officer development, staffing, payroll, and ensuring that their crews were appropriately

2  trained, encompassed "the overwhelming majority of the Battalion Chiefs' time during their

3  respective 24-hour shifts." (Olson Decl. ¶ 6; *see also* Koellermeier dep. at 72:3-25.) In sum, the

4  BCs spend at least 50% of their time on exempt management duties, thus confirming

5  management as their primary duty. 29 C.F.R. § 541.700(b).

6          **c.    It is undisputed that the BCs enjoy relative freedom from
                   direct supervision and are paid substantially more than front
7                  line firefighters and captains**.

8          During shifts, a BC is normally the highest ranking officer at the station where he works

9  and almost without exception the highest ranking officer on scene. (Griffee dep. at 15:15-19;

10 Molina Decl. ¶ 2.) Where oversight is neither "rigorous nor . . . frequent," an employee is

11 relatively free from supervision. *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1104 (9th Cir.

12 2001). Neither the Fire Chief nor the Deputy Fire Chief are dispatched to emergencies, leaving

13 command to the BC. (Molina dep. at 26:7-11.) Chief Molina finds it unnecessary to even listen

14 in on the radio because the BCs are "really good incident commanders" and do not require his

15 supervision. (*Id.*) As Schuman testified, "Battalion Chief[s] ha[ve] direct authority over

16 anybody else that shows up on the fire scene." (Schuman dep. at 70:23-24); *see also* 69

17 Fed. Reg. at 22130; *Morrison*, 576 F.3d at 769-70 ("[F]ighting fires is the more important part

18 of the [Captains'] job[,] . . . unlike the high-level fire officials contemplated as exempt by the

19 [DOL], with the discretion to determine whether and where their assistance is needed.")

20 (quotations omitted). Even Deputy Chiefs do not have the "same span of control" as BCs at an

21 incident. (Molina dep. at 21:1-4; *see also* Michael Decl. ¶ 4) Plaintiffs exercise additional

22 discretionary power while working in the office, focusing battalion trainings based on the skills

23 they believe the battalion needs to strengthen. (Steele dep. at 35:10-19.)

24         Finally, it is undisputed that the Chiefs receive a significantly higher rate of pay—"at

25 least 21.5% more than the … highest earning … captain," their immediate subordinates.

   (Coleman Decl. ¶ 5 & Ex. 1 § 6.1; *see also* Molina Decl. ¶ 12). The Plaintiffs' elevated

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 29
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

compensation over their subordinates weighs strongly in favor of the conclusion that the Plaintiffs are exempt. *Baldwin*, 266 F.3d at 1115-16 (noting that, as managers, the plaintiffs' received a higher base salary than their subordinate assistant managers, which supported their exempt status); *see also* 29 C.F.R. § 541.700(a).

Because the Plaintiffs' primary duty is management, the first responder regulation, 29 C.F.R. § 541.3(b), which presumes the opposite has no application. And because the Plaintiffs' "primary duty [undisputedly] includes office or non-manual work" (Griffee dep. ex. 2 at 3), they are HCEs, making them "exempt under section 13(a)(1)" of the FLSA. 29 C.F.R. § 541.601. That should end the analysis, and this case.

### C. Even assuming the HCE cannot be applied to BCs, Plaintiffs are still exempt under the four-part "executive" test or combination test.

If, for some reason, the Court concludes that § 541.601 cannot be applied to BCs, the Plaintiffs are still exempt under the traditional executive test of § 541.100(a). This test requires four elements: the employee must (1) be paid on a salary basis at a rate not less than $913 per week;[5] (2) have a "primary duty of management"; (3) "customarily and regularly direct[] the work of two or more other employees"; and (4) retain the authority to make "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees" and whose suggestions are given "particular weight." *Id.* § 541.100(a)(1)-(4). Plaintiffs undisputedly made at least $913 per week the three years preceding this lawsuit. (Lloyd Decl. Ex. I (RFAs 9-69).) As argued above, their primary duty was management of their battalions, *supra* Part IV.B.3, and each Plaintiff undisputedly supervised multiple people every shift. (Molina Decl. ¶ 2; Griffee dep. at 32:3-20; Tracy dep. at 10:12-24; Huffman dep. at 15:13-16:7; Schuman dep. at 16:18-17:10; Hazelton dep. at 17:8-18:23; Lines dep. at 18:1-21; Steele dep. at 16:7-17:3; Willis dep. at 28:16-29:2.) At a minimum, the Court should determine these elements as a matter of law. FRCP 56(g).

---

[5] See 29 C.F.R. § 541.600(a). From 2014-2016, the section required an employee to make $455/week. This figure was raised to $913 in 2016 and remains so at present. 81 Fed. Reg. 32391, 32393 (May 23, 2016).

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 30
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

1    Thus the only question that would remain is whether the Plaintiffs "ha[d] the authority

2    to hire or fire other employees or whose suggestions and recommendations as to the hiring,

3    firing, advancement, promotion or any other change of status of other employees [we]re given

4    particular weight." 29 C.F.R. § 541.100(a)(4). The DOL outlines several non-exclusive "factors

5    to be considered," which "include, but are not limited to, whether it is part of the employee's

6    job duties to make such suggestions and recommendations; the frequency with which such

7    suggestions and recommendations are made or requested; and the frequency with which the

8    employee's suggestions and recommendations are relied upon." Id. § 541.105. Critically, "[a]n

9    employee's suggestions and recommendations may still be deemed to have 'particular weight'

10   even if a higher level manager's recommendation has more importance and even if the

11   employee does not have authority to make the ultimate decision as to the employee's change in

12   status." Id. Thus, it is immaterial that Fire Chief Molina has final say as to whether an

13   individual is hired, fired, promoted, advanced, or is given some "other change of status." Id.

14       Under state law, hiring and promotions in fire departments are generally covered by

15   civil service rules. *See generally* ch. 41.08 RCW. In Vancouver, applicants to become an entry-

16   level or lateral firefighter take a civil service examination, from which they are ranked

17   according to their score. (Coleman Decl. ¶ 10.) From this list, "the Fire Chief has the discretion

18   to choose any one of the top ten scores—in essence, the top ten candidates are interviewed on

19   equal footing." (*Id.*) But Chief Molina does not make this decision alone; rather he convenes a

20   panel that "almost without exception" has included a BC. (*Id.* ¶ 11; *see also* Scarpelli dep. at

21   14:5-13; Molina Decl. ¶ 14.) Of the 14-plus interview panels since the beginning of 2015, only

22   three went forward without a BC present, and that was due to scheduling. (Coleman Decl.

23   ¶ 12.) According to Chief Molina, he "regularly include[s] a Battalion Chief on the Chief's

24   Panel because of their unique perspective in managing fire fighters in the field." (Molina Decl.

25   ¶ 15.) And though Plaintiff Schuman most often filled this need, Chief Molina affirms that was

done "for scheduling reasons," and he would certainly have invited a different BC if Schuman

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 31
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

1    was unavailable. (*Id.* ¶ 16.) Plaintiffs cannot dispute this; to be sure, it is undisputed that Lines,

2    Willis, and Tracy all served on the Chief's Panels. (Coleman Decl. ¶¶ 13-24 & Exs. 8-15.) And

3    it is beyond dispute that each panel schedule allocated time for the panel to "debrief" following

4    the interview or interviews. (*Id.* ¶ 13 & Exs. 8, 10, 11, 14.) The record confirms that the BC

5    who attended the interview took notes and commented following the interviews on whether the

6    candidate would succeed if hired. (*Id.* ¶¶ 13-24 & Exs. 8-15.) Chief Molina confirms that he

7    relied extensively on the point of view of every panelist, including the BC, when deciding

8    whether or not to extend a conditional offer. (Molina Decl. ¶¶ 17-18; *see also* Scarpelli dep. at

9    22:16-24:18; Molina dep. at 74:10-18, 90:6-7; Schuman dep. at 72:12-13; Willis dep. 50:3-4.)

10          The same is true of promotions to the rank of captain, which invariably includes at least

11    one battalion chief on the final panel. (Molina Decl ¶ 19; Olson Decl. ¶¶ 10-11; Patterson Decl.

12    ¶¶ 2-3; Michael Decl. ¶¶ 6-7.) The deputy chief, who leads the panel, asks that a battalion chief

13    be present in the interview to advise whether there is any reason to skip the top ranking civil

14    service candidate. (Olson Decl. ¶¶ 10-11; Michael Decl. ¶ 7.) Chief Molina relies on the panel's

15    recommendation when making the decision of who to promote. (Molina Decl. ¶ 19; Molina

16    dep. 53:25; 73:11-13.) At deposition, Plaintiffs admitted their opinions on the promotional

17    candidates "were reflected by the scoring" that was given when they "rated" them. (Huffman

18    dep. at 42:24-25; *see also id.* at 40:6-42:23.)

19          Furthermore, as Chief Michael makes clear, "Battalion chiefs also are the first link in

20    the evaluation of whether a probationary captain (i.e., someone in his or her first year as a

21    captain) should pass probation." (Michael Decl. ¶ 9.) "The battalion chief would pass the

22    recommendation to the Deputy Chief of Operations (me), and I would pass that

23    recommendation on to the Fire Chief for final determination as to whether the individual should

24    pass probation." (*Id.*) And finally, the record shows that BCs made recommendations that

25    certain probationary firefighters be terminated (Schuman dep. at 81:2-85:7 & dep. exs. 11-12;

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 32
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

1  Hazelton dep. at 31:18-35:20 (recommending termination of a probationary firefighter)), or that

2  others pass probation (Michael Decl. ¶ 9).

3      The foregoing testimonial and documentary evidence confirms that the rank of BC,

4  which each Plaintiff holds or held, had the authority to make suggestions or recommendations

5  as to whether a candidate would be hired, promoted, terminated, and/or receive a change in

6  status. Consequently, the fourth and final element of § 541.100 is met, rendering the Plaintiffs

7  all exempt as a matter of law.

8      **D.    At a minimum, the Court should hold that Tracy and Huffman were exempt executive, administrative, or combination employees during their acting tenures as Deputy Chief and Division Chief.**

9

10     To the extent Plaintiffs Tracy and Huffman contend that their time spent in these out-of-

11  class temporary assignments should be included in this lawsuit,[6] the Court should reject it.

12     Similar to executive employees, exempt administrative employees are those (1) who are

13  compensated at a weekly rate of at least $ 913; (2) "whose primary duty is . . . office or non-

14  manual work directly related to the management or general business operations of the

15  employer . . . ; and [3] whose primary duty includes the exercise of discretion and independent

16  judgment." 29 C.F.R. §§ 541.200(a), .600(a). It bears repeating that Ninth Circuit precedent

17  previously requiring that exemptions be viewed narrowly is no longer valid. *Encino Motorcars*,

18  138 S. Ct. at 1142. Properly given a "fair interpretation," *id.*, the administrative exemption

19  precludes any award of unpaid overtime for Tracy and Huffman during these assignments.

20     Again, there is no dispute that Chiefs Tracy and Huffman met the minimum salary

21  requirement for both administrative and executives. (Lloyd Decl., Ex. I.); *see also* 29 C.F.R.

22  § 541.600(a). There can be no dispute that the primary duty of the deputy chief is "office or

23  non-manual work directly related to the management or general business operations of" the

24  City. 29 C.F.R. § 541.200(a). Work that is "directly related to the management" includes

25

---

[6] Chiefs Tracy and Huffman have made no affirmative argument that these positions are included in this lawsuit; Chief Tracy testified that he did not know whether this lawsuit included these positions. (Tracy dep. at 9:1-12.)

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 33
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

"finance; budgeting; . . . purchasing; procurement; . . . personnel management;. . . safety and health; labor relations; . . . and similar activities." *Id.*§ 541.202(b). The Deputy Chief's duties include creating a budget; ordering department vehicles; and attending labor relation meetings. (Tracy dep. at 51:15-23; Koellermeier dep. at 10:24-11:9.) Tracy in particular held "significant responsibility in terms the budget, and the management and supervision of logistics, facility coordination, as well as vehicle maintenance." (Molina Decl. ¶ 22.) Tracy admitted as much at deposition. (Tracy dep. at 51:12-14,) The assignment required Chief Tracy to work in an office 40 hours per week, and these administrative duties were "his primary function" during that time. (Molina Decl. ¶¶ 21-22; Tracy dep. at 52:20-22.)

Although the rank is subordinate to the Deputy Chief, proper analysis yields the same conclusion for the time both Tracy and Huffman spent as Acting Division Chiefs of Training. Both worked primarily a 40-hour workweek in an office. (Molina Decl. ¶ 21; Tracy dep. at 51:18-20.) According to Tracy, the Training Chief was in charge of "supervis[ion] and oversight of the training department of [VFD]." (Tracy dep. at 55:21-22.) It is also responsible for reviewing performance records for trends and consulting on whether a recruit passes probation. (Huffman dep. at 67:17-23; Tracy dep. at 50:3-7.) The Training Chief undisputedly submits recommendations and comments to the Fire Chief about a recruit's progress (Huffman dep. at 67:17-23), and Chief Huffman acknowledged that he would approach the Operations Chief to voice his concerns (*id.* at 47:11-16). He additionally testified that this usually resulted in the recruit's termination or resignation. (*Id.*) Tracy testified that he recommended termination of one recruit while acting as Training Chief. (Tracy dep. at 40:17-41:6.) Chief Molina considers both positions to be part of the "core administrative staff," signaling the importance of theses duties to the character of the positions. (Molina dep. at 12:9-11.) Additionally, it is undisputed that both the Deputy Chief and Training Chief are relatively free from direct supervision during most of their work. (Tracy dep. at 52:18-22; Molina Decl. ¶¶ 21-22 (noting that Training Chief works away from VFD Headquarters).)

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 34
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

It also cannot be disputed that both the Deputy Chief and the Training Chief positions exercise "discretion and independent judgment" in regards to "matters of significance." 29 C.F.R. § 541.200(a). This discretion need only be the ability to "make … independent choice[s], free from immediate direction or supervision." *Id.* § 541.202(c). The Deputy Chief must undertake an evaluative approach to prepare a budget, exercising independent judgment in the process, as well as initiating large purchases on behalf of the VFD. (Tracy dep. at 51:7-17, 52:21-22.) Similarly significant, the Training Chief must prioritize training topics, review performance trends to determine where more training may be needed, and decide when to report a struggling recruit's performance to the Operations Chief. (Tracy dep. at 55:19-22 (job was to "supervise and oversight of the training department of the Vancouver Fire Department"); Huffman dep. at 67:21-23.) All of these components of the job are unquestionably "matters of significance." 29 C.F.R. § 541.202(b).

Tracy and Huffman were responsible for exempt administrative work and were required to exercise their discretion in effectuating training and responding to performance evaluations. During their respective assignments, the Chiefs were therefore acting as administrative employees and are exempt under § 541.200 or the combination exemption of 29 C.F.R. § 541.708 ("Employees who perform a combination of exempt duties as set forth in the regulations in this part for executive [and] administrative … employees may qualify for exemption. Thus, for example, an employee whose primary duty involves a combination of exempt administrative and exempt executive work may qualify for exemption.").

### E. Plaintiffs have insufficient evidence to overcome the presumptive two-year statute of limitations for FLSA claims.

In the event any portion of this lawsuit advances, the Court should apply the two-year statute of limitations because the Plaintiffs cannot produce sufficient evidence of willfulness, which would be required to extend the statute of limitations to three years. 29 U.S.C. § 255. Plaintiffs bear the burden to prove willfulness, which they cannot show absent proof the City "knew or *showed reckless disregard for the matter of whether* its conduct was prohibited by

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 35
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

the FLSA." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 130 (1988) (emphasis added). Plaintiffs have insufficient evidence to meet their burden on this issue. FRCP 56(c)(1)(B).

It is undisputed that the decision to pay an overtime rate of 1.25 stemmed from a proposal by the Plaintiffs' union that resulted in a mutual agreement in 2003—well over a decade before this lawsuit was filed. (Coleman Decl. ¶ 6 & Exs. 3-4.) It is also beyond dispute that the City researched at the time whether the FLSA would allow such a provision in a collective bargaining agreement. (*Id.* ¶ 6 & Ex. 3; Baker Decl. ¶¶ 3-4; Watts Decl. ¶ 2.) And it is beyond dispute that no Plaintiff (or other BC) claimed the decade-plus agreement conflicted with the FLSA until late 2016. (Coleman Decl. ¶ 6; Baker Decl. ¶ 5; Watts Decl. ¶ 3; Molina Decl. ¶ 25.) At that point, the City researched its obligations and confirmed through the DOL's 2005 Opinion Letter that § 541.3 did not, without more, render Vancouver's BCs to be nonexempt. (Molina Decl. ¶ 25; Coleman Decl. ¶ 7.) As the Supreme Court has held, "If an employer acts reasonably in determining its legal obligation, its action cannot be deemed willful." *McLaughlin*, 486 U.S. at 135 n.13; *accord SEIU, Local 102 v. County of San Diego*, 60 F.3d 1346, 1355 (9th Cir. 1994) employers who "rel[y] on substantial legal authority" in their FLSA determinations do not commit a willful violation). Plaintiffs cannot meet their burden to demonstrate the City's willfulness. At a minimum, the City did not act willfully, meaning the two-year statute of limitations applies.

## V.  CONCLUSION

As the stipulated job description at issue plainly states, a Vancouver battalion chief "*is a management level position* involving the *coordination and administration of the activities of an entire shift*." (Griffee dep., dep ex. 2 (emphasis added).) The possibility that a BC—or even a deputy chief—might be needed to engage in fire suppression is not enough to override the every-day reality that the position is management. The Plaintiffs' primary duty is management, meaning they are exempt from additional overtime under the FLSA, and entitling the City to summary judgment. The Court should grant the City's motion and dismiss this action.

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 36
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

1        DATED on July 31, 2018.

2                                        CITY ATTORNEY'S OFFICE
                                         VANCOUVER, WASHINGTON
3
                                         By:_____/s/ Daniel G. Lloyd_____
4                                            Daniel G. Lloyd, WSBA No. 34221
                                             Sara E. Baynard-Cooke, WSBA No. 35697
5                                            Assistant City Attorneys
                                             Attorneys for Defendant City of Vancouver
6                                            PO Box 1995
                                             Vancouver, WA 98668-1995
7                                            **Tel:** 360.487.8500; **Fax:** 360.487.8501
                                             dan.lloyd@cityofvancouver.us
8                                            sara.baynard-cooke@cityofvancouver.us

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 37
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501

1
2
3

**CERTIFICATE OF SERVICE**

I hereby certify that on the date provided below, I electronically filed the foregoing document and the corresponding proposed order with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following individual(s):

4
5

Ms. Katelyn S. Oldham
Tedesco Law Group
**Email:** katelyn@miketlaw.com

6
7

DATED on July 31, 2018.

8

CITY ATTORNEY'S OFFICE
VANCOUVER, WASHINGTON

9
10
11
12
13

By:_____/s/ Daniel G. Lloyd_____
    Daniel G. Lloyd, WSBA No. 34221
    Assistant City Attorney
    Attorney for Defendant City of Vancouver
    PO Box 1995
    Vancouver, WA 98668-1995
    **Tel:** 360.487.8500; **Fax:** 360.487.8501
    dan.lloyd@cityofvancouver.us

14
15
16
17
18
19
20
21
22
23
24
25

5925.docx
DEF. CITY OF VANCOUVER'S MOT. FOR SUMM. J. - 38
(W.D. Wash. Cause No. 3:17-cv-05414-RBL)

CITY ATTORNEY'S OFFICE
PO BOX 1995
VANCOUVER, WA 98668
Tel: (360) 487-8500 * Fax: (360) 487-8501